Ember M. Schrag, appellant, v.
Andrew S. Spear, appellee.

___ N.W.2d ___

Filed July 15, 2014.    No. A-13-258.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Modification of Decree: Child Support: Appeal and Error.** Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion.

3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4. **Child Custody.** Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

5. **Child Custody: Proof.** The party seeking modification of child custody bears the burden of showing a material change in circumstances.

6. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

7. **Child Custody: Proof.** Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.

8. **Child Custody.** According to Neb. Rev. Stat. § 43-2923(1) (Cum. Supp. 2012), the best interests of the child require a parenting arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress.

9. ____. In addition to the statutory factors relating to the best interests of the child, a court may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension, regardless of chronological age, and when such child's preference is based on sound reasons; and the general health, welfare, and social behavior of the child.

10. **Modification of Decree: Child Custody.** Not every change warrants a change in custody. The best interests of the children are not served by constant custody disputes and a shifting of custody control from one parent to the other.

11. **Modification of Decree: Child Custody: Evidence: Time.** Evidence of the custodial parent's behavior during the year or so before the hearing on the motion to modify is of more significance than the behavior prior to that time.

12. **Modification of Decree: Child Custody.** In order to find that a material change in circumstances has occurred in child custody determinations, the changes in the parties' circumstances must be significant enough to have affected the best interests of the children involved.

13. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

14. ____. Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state.

15. ____. Legitimate employment opportunities may constitute a legitimate reason for leaving the state when there is a reasonable expectation of improvement in the career or occupation of the custodial parent.

16. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in light of reasonable visitation.

17. **Child Custody.** The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party.

18. ____. In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties.

19. ____. The list of factors to be considered in determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the child should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted.

20. **Rules of the Supreme Court: Child Support.** The Nebraska Child Support Guidelines provide that earning capacity may be considered in lieu of a parent's actual, present income when the circumstances merit. Earning capacity may include factors such as work history, education, occupational skills, and job opportunities.

21. **Child Support: Evidence.** Earning capacity should be used in determining a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts.

22. ____: ____. When the evidence demonstrates that the parent is unable to realize a particular earning capacity by reasonable efforts, it is clearly untenable for the trial court to attribute that earning capacity to the parent for purposes of determining child support.

23. **Child Support.** A reduction in child support is not warranted when an obligor parent's financial position diminishes due to his or her own voluntary wastage or dissipation of his or her talents and assets and a reduction in child support would seriously impair the needs of the children.

Appeal from the District Court for Lancaster County: Steven D. Burns, Judge. Affirmed in part, and in part reversed and remanded with directions.

Stephanie R. Hupp and Zachary L. Blackman, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., L.L.O., for appellant.

Amie C. Martinez, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellee.

Irwin, Moore, and Bishop, Judges.

Per Curiam.

Ember M. Schrag appeals from an order of the district court for Lancaster County which modified custody of the parties' daughter, Lillian Schrag, to award her father, Andrew S. Spear (Andrew), primary physical custody; denied Ember's application to remove Lillian from Iowa to New York; removed a visitation restriction on Ember's adoptive mother; and ordered Ember to pay child support based upon a prior earning capacity. For the reasons that follow in our opinion below, we reverse the modification of custody and the denial of Ember's application to remove Lillian to New York. However, we affirm the removal of the visitation restriction on Ember's adoptive

mother and the award of child support for the time that Lillian has been in Andrew's primary physical custody.

## I. FACTUAL BACKGROUND

Ember and Andrew are the biological parents of Lillian, who was born in November 2007. They were never married and did not live together after Lillian was born. At the time of Lillian's birth, Ember resided in Lincoln, Nebraska, and Andrew resided near Kansas City, Missouri. Ember filed a paternity action in the district court for Lancaster County on November 7, 2007, and a temporary order was entered in March 2008, approving the parties' stipulated agreement. The agreement provided for Ember to have temporary custody of Lillian subject to Andrew's parenting time, which consisted of every other Saturday in Lincoln. Andrew was also ordered to pay child support. On January 21, 2009, the district court entered a final order of paternity awarding Ember custody of Lillian, subject to Andrew's rights of parenting time set forth in the parties' parenting plan, and requiring Andrew to pay Ember child support and half of her incurred childcare costs. Andrew's regular parenting time consisted of every third weekend from 9 p.m. on Thursday until 9 p.m. on Tuesday, together with holiday parenting time and summer parenting time which began as two 1-week periods in 2009 and gradually increased each year, concluding with two 3-week periods in 2012. Andrew provided all transportation for his parenting time and was allocated a $100-per-month reduction in his child support obligation, from $349 per month to $249 per month, because of this. A judgment of $330 per month was also entered against Andrew to cover his share of childcare costs.

Just over 2 weeks later, on February 6, 2009, in response to an order to show cause filed by Ember on December 10, 2008, seeking payment for amounts due from Andrew under the prior temporary order, the district court entered an order adopting an agreement reached by the parties. That agreement included a judgment of $2,085 owed by Andrew to Ember, payable at $100 per month, with said judgment resolving childcare costs owed by Andrew through January 30, 2009. Based

on this agreement, the previously entered order to show cause was vacated.

On November 6, 2009, Ember again filed a motion for an order to show cause, claiming that Andrew was behind in child support by $797.27 and in childcare by $2,469.55 and that he still owed $1,988.94 on the judgment entered in the prior contempt proceeding. On December 18, a contempt order was entered against Andrew, committing him to 30 days in the Lancaster County jail, but which provided for a suspension of the sentence as long as Andrew paid the amounts indicated in the contempt order.

A little over a year later, in February or March 2011, Ember moved with Lillian from Lincoln to Decorah, Iowa. She made this move because she and Bryan Day, her boyfriend at the time, were not in a good financial situation in Lincoln and Day's parents had offered them a free place to live in their home in Decorah. In April 2011, Ember and Day married. Ember claimed that during a telephone call with Andrew in February, she requested permission from Andrew to move to Decorah. She stated that Andrew seemed "very amicable" when he told her, "'I don't care if you move anywhere in the world, as long as I still get to see Lillian.'" Ember told Andrew that he would need to sign modification papers, and she was under the impression he was in agreement. He even agreed to change the visitation exchange location to Des Moines, Iowa, and they met in Des Moines on a couple of occasions. But when she gave him the modification papers to sign during an exchange in April (when Andrew was picking up Lillian for his parenting time), he refused to sign the papers. And when he was supposed to meet in Des Moines to return Lillian to Ember, Andrew told Ember that he would no longer consent to meet in Des Moines and that Ember would have to drive to Lincoln, a 7-hour drive for Ember, to pick up Lillian. About 1 hour before the scheduled exchange time in Lincoln, Andrew texted Ember that he would not be bringing Lillian back because he had been given emergency custody of Lillian.

Andrew had filed an action to modify the paternity order and sought emergency custody of Lillian. On April 26, 2011, an order for ex parte custody was entered, awarding Andrew

custody of Lillian pending a later temporary custody hearing. On May 31, following the temporary custody hearing, the court restored custody of Lillian to Ember. In that order, the court noted that Andrew's affidavit in support of the ex parte custody order stated that Ember had moved without the court's approval and without Andrew's consent or agreement. The court then stated:

> As a result of the most recent hearing where both parties had an opportunity to present affidavits, that statement turns out not to be the case. It is true that the court has not approved the move. It is not true that the move was made without [Andrew's] consent. [Andrew's] own affidavit discloses that he knew of the move and agreed to it.

The court also noted that "[Andrew's] ex parte affidavit also states that he did not know the whereabouts of his child from January, 2011 to April 26, 2011. Again, following the hearing where both parties had an opportunity to present evidence, this proves not quite to be the fact." The court then stated, "These discrepancies are significant in that they formed the basis for the need for ex parte action on the part of the court." The court concluded that the ex parte order "should not have issued," vacated the order, and restored custody of Lillian to Ember.

On February 22, 2012, a modification order was entered which approved a joint stipulation and parenting plan submitted by Ember and Andrew and which granted Ember permission to move Lillian to Iowa. The parenting plan specified that Ember and Andrew would share joint legal custody of Lillian and stated that the parties "shall discuss educational, medical, religious and social decisions concerning the parenting functions necessary to raising the child. In the event of an impasse, [Ember] shall have the final say; however, [Andrew] retains the right to submit the issue to mediation or return to Court." The parenting plan also provided that the principal place of residence of Lillian during the school year would be with Ember. Andrew was provided parenting time which included various school breaks and holidays, together with all of the summer break from school except for the first and last full weeks of

the summer break. It was agreed that the most effective way to communicate regarding Lillian was for either parent to send an e-mail to the other parent and to follow up with a telephone call. The parties agreed to share transportation responsibilities, and the record shows that they met in Des Moines for parenting-time exchanges. The parties also included a provision in the plan stating that Ember's mother by adoption, Cindy Chesley, would not have any contact with Lillian unless such contact was supervised by either party. The parties further agreed to reside in the states of Nebraska, Missouri (including the Kansas City metropolitan area), and Iowa unless otherwise agreed to by the parties. The parties stated their intention for Nebraska to maintain jurisdiction as the home state for Lillian. Finally, the parties agreed that they "can temporarily change the terms of this Plan as long as they both agree to it in writing," but they also acknowledged that any permanent changes to the plan required court approval before the change would become binding and enforceable.

Lillian spent the summer of 2012 with Andrew, returning to Ember on August 27, 2012. On that day, the parties met at the agreed-upon location in Des Moines. They exchanged cordial conversation, and no mention was made by Ember that she was moving Lillian to New York that day. On August 30, Ember notified Andrew in an e-mail that she had separated from Day. (Ember's divorce from Day was finalized when an Iowa district court entered a decree of dissolution on September 6.) In the August 30 e-mail, Ember also informed Andrew that Day was her only connection to Iowa and that without him, there was no reason to stay in Iowa. Ember explained that she had "spent the summer working on the east coast and developing a new support system in Philadelphia and New York City." Ember noted that she had "gotten an opportunity to move to New York City that will greatly improve Lillian's situation." The e-mail also noted:

> Although this is the first you're hearing of it, this is not sudden, and it will be the best for Lillian. I'll be in a much better spot, better able to care for her and spend time with her. We'll be living in a very nice neighborhood in [New York City].

Ember stated that because of New York's age requirements for school, Lillian would be starting kindergarten that fall, and Ember included a list of schools that Lillian could attend. Ember stated, "I'd appreciate your response regarding input into her educational opportunities," and then she provided Internet links to a Montessori school, along with links to two public schools—one school which Lillian would be automatically "zoned" to attend based on where they would live and the other school in a closer location where the children of several of Ember's friends attended. Since Lillian would be in school, Ember noted that Andrew would no longer have to contribute to childcare expenses. In the e-mail, Ember also stated that she would pay for the travel expenses when Andrew had his parenting time, mentioned the "hugely increased cultural opportunities available to Lillian," and indicated that Lillian would be attending a highly regarded dance school (Mark Morris Dance Center). Andrew replied on September 1, saying only, "I do not agree moving Lillian to New York is what's best for her." Within the week, on September 7, he filed a complaint to modify, seeking a change in custody of Lillian. On September 20, Ember filed an answer and counterclaim, wherein she sought the court's permission to move Lillian to New York. That same day, Ember also filed a motion for order to show cause asserting that Andrew was willfully refusing to pay ongoing childcare costs in the amount of $7,758.91, a childcare judgment for $962.35, and an attorney fee judgment of $600. An order to show cause was issued on January 4, 2013, showing that the contempt matter would be heard on February 11, the same day the matter was scheduled for trial.

On February 11, 2013, trial was held on Andrew's complaint and Ember's counterclaim. Ember, age 27 at the time of trial, is a folk singer. During the summer of 2012, while Lillian was with Andrew and in light of her separation from Day, Ember was looking for a new living arrangement and support system either in Philadelphia, Pennsylvania, or New York City, New York. Since she and Day had been living with Day's parents, she could no longer stay there, and she had no other family or friends in Decorah. Ember did not consider moving back to Nebraska because the only family

there was her adoptive mother, Chesley (who lived in North Platte, Nebraska), and Ember had been estranged from her for 2 years. Ember believed Philadelphia and New York City seemed to offer the best options, so for part of the summer, she was "housesitting in Philadelphia," while she also engaged in musical opportunities. She had a Philadelphia record label put out her second full-length album, and she had a lot of friends with whom she could collaborate musically, so she also played several shows while there. In considering Philadelphia as a possible place to live, Ember evaluated neighborhoods. She had many people tell her that the public schools were not very good, which was also in the news. Ember noted that the "rent wasn't as expensive there as some places," but that it "just didn't feel as safe to me."

Ember ultimately decided to move to New York. Although Ember has no family in the New York area, she had many musician friends there, and she believed that New York would enhance Lillian's quality of life. The educational opportunities were significant, and Ember was going to be able to spend more time with Lillian than ever before. Ember stated, "I'm really happy to be able to pick her up every day, and I feel more relaxed because I'm in a supported place where I can work on my music in a way that doesn't take me away from her."

From the end of August 2012 until the district court's order in February 2013, Ember and Lillian resided with Robert Bannister in his two-bedroom apartment in New York City. Ember and Bannister share one of the bedrooms while Lillian has her own bedroom. Ember met Bannister in March 2011 at a concert. She reconnected with Bannister at a concert in Chicago in May 2012 and began a romantic relationship with him about a month later.

At the time of trial, Bannister was 52 years old and was the director of the quality assurance department at an educational software development company. Bannister had been estranged from his second wife for 5 years, but was not yet legally divorced. He testified that he still supported his second wife by paying certain bills for her. Bannister had a son studying science at a college north of New York City.

Bannister shared custody of his son, who, prior to college, resided with Bannister rather than his mother during the week because Bannister's apartment was closer to his high school. When Bannister's son occasionally visits from college, he and Lillian enjoy interacting with each other, including doing science experiments together.

Ember conceded at trial that she is dependent on Bannister to provide Lillian and her with a place to live, but was adamant that her relationship with him did not show any signs of instability. Bannister also testified that he did not anticipate his relationship with Ember would terminate in the foreseeable future.

Since moving to New York, Ember has essentially become a stay-at-home mother caring for Lillian. Ember testified that while Lillian is at school or asleep, Ember works on composition, rehearsal, and promotion of her music career. During the fall of 2012, Ember traveled to other cities to perform shows and was away from home for only two to three evenings, during which time Bannister cared for Lillian. Ember testified that New York has been beneficial for her career as a musician because she can perform at night while Lillian is sleeping and these performances have more impact on her career.

According to Ember, Lillian did not have much difficulty adjusting to life in New York. Ember described Lillian as outgoing, extroverted, creative, friendly, smart, and confident. Ember indicated that Lillian seems to be comfortable, secure, and happy in New York. Lillian was able to begin kindergarten at a nearby school, and she has generally done well at school. Lillian participates in afterschool programs, including science and music. Lillian attends a creative dance class, and a music instructor comes to their home to give Lillian violin lessons. Letters from her violin teacher and dance instructor were received into evidence and highlighted Lillian's budding abilities. Additionally, Ember presented evidence to suggest that Lillian has developed a strong relationship with Bannister.

Testimony from Ember, Bannister, and a friend and neighbor of Bannister was received concerning the neighborhood they live in and about Ember's care of Lillian. Various

photographs of the area were received in evidence. The area is residential with many different types of old buildings, and there are playgrounds and parks nearby. Bannister's friend described the neighborhood as "family oriented." None of these individuals had any concerns about the neighborhood with respect to criminal activity or violence. The building that Bannister lives in has a security doorman. Bannister's friend's youngest daughter and Lillian are close in age, and he sees Lillian and Ember nearly every day before and after school. He has no concerns about Ember's parenting. He testified that Bannister is protective of Lillian and that their home is a supportive environment for Lillian's creativity. Ember walks Lillian to and from school every day. According to Ember, Lillian has friends through school and in the neighborhood. Ember takes Lillian to the nearby playground, parks, and museums. Ember helps Lillian with her homework, cooks the meals, bathes her, and reads to her, and they sing and play instruments together. Bannister engages in and assists with many of these activities.

Ember does not believe that physical custody of Lillian should be modified, because Ember has always been Lillian's primary caregiver and because a change in custody would cause serious disruption. Although the record shows that Andrew was current on child support at the time of the modification hearing, Ember also questioned whether Lillian was a priority for Andrew, since he had not regularly paid his child support in the past. Ember was also concerned about Andrew's contact with Chesley.

Andrew married his wife, Holly Spear, in October 2010. They have a son who was nearly 2 years old at the time of trial, and they were expecting another baby boy due to be born in June 2013. Andrew works as a restaurant general manager for a franchisee of a pizza restaurant. He testified at trial that he was training to become an area manager. Andrew typically works Monday through Saturday, from 8 a.m. to 6 p.m. On Sundays, he and his family attend church together. Andrew earns 3 weeks of vacation each year, which he typically takes in the summer when Lillian is with him. Holly also works at a restaurant, and she testified that she will be changing her

hours to 9 a.m. to 3 p.m. so that she is available to take Lillian to and from school. Currently, Andrew's aunt provides daycare in her home for Andrew and Holly's son at no charge, and she will also do so for both Lillian and the new baby.

Andrew and Holly are currently renting a home in Liberty, Missouri, and are working toward being able to purchase a home. Photographs of their home were received in evidence, in addition to the public school that Lillian would attend and a nearby park. Andrew testified that Lillian is comfortable in his home and that the consistency he provides to Lillian is good for her.

Andrew has many relatives in the Kansas City area, including his parents, grandmother, brother, aunts and uncles, and numerous cousins. Lillian has several cousins near her age that she enjoys getting together with. Lillian also has friends in Andrew's neighborhood that she plays with. Andrew and Holly testified about some of the activities that they do with Lillian, including crafts, going to museums, and working with flashcards. Andrew and Holly both testified to having a close relationship with Lillian.

Chesley has been visiting Lillian at Andrew's home under his supervision since the previous court order. Chesley testified to her observations of the interaction between Andrew and Lillian. She indicated that Andrew is very tender with Lillian and that there is a lot of cuddling between the two. Chesley believes that Lillian feels safe with Andrew and respects him. According to Chesley, Andrew is firm and there are clear rules in his home, Andrew is very engaged with Lillian, and Lillian has a close relationship with her half brother. Chesley testified regarding concerns that she had about Ember's care of Lillian, but she has not been able to observe the relationship since Chesley and Ember's estrangement in early 2011. Chesley admitted that she has paid a portion of Andrew's attorney fees in connection with this proceeding and that she had previously assisted Ember with her attorney fees.

Andrew believes that Lillian's best interests require a change of custody. Andrew testified regarding his concerns about Ember's parenting, the move to New York, and the new relationship with Bannister. Specifically, he indicated, "I don't

think [New York City] is the neighborhood that I want my daughter growing up in." He also pointed to the instability in Lillian's life over the last couple of years with the frequent moves and changes of significant people in her life. Andrew testified that the "nomadic life" is not good for Lillian. Andrew highlighted the stability that he has had in his family life—he has lived and worked in the same area for several years and has regularly exercised the parenting time provided to him by the various orders.

On February 27, 2013, the district court entered its order denying Ember's request for removal and modifying custody of Lillian to Andrew. In its order, the court found that Ember did not have a legitimate motive to move to New York and that removal was not in Lillian's best interests. In granting Andrew's modification request, the court noted that this change in custody was going to be another abrupt change in Lillian's life, but believed that this change would stop the pattern of sudden, dramatic changes. The court also lifted the supervised contact restriction on Chesley, revised the parties' child support obligations, and indicated that the parties had reached an agreement on the contempt matter.

Ember filed a motion for a new trial. The district court denied this motion, but issued an amended order on March 18, 2013. Ember appeals from this order.

## II. ASSIGNMENTS OF ERROR

Ember assigns and argues four errors. She alleges, summarized, restated, and reordered, that the district court erred in (1) modifying custody, (2) denying her application to remove Lillian to New York, (3) removing the requirement that Chesley's visitation with Lillian be supervised, and (4) calculating her child support obligation.

## III. STANDARD OF REVIEW

[1] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

[2] Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013).

[3] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Watkins v. Watkins, supra*.

## IV. ANALYSIS

### 1. MODIFICATION OF CUSTODY

Ember argues that the district court erred when it determined that Andrew should be awarded primary physical custody of Lillian. She claims that there has been no material change in circumstances and also believes that a change in custody is not in Lillian's best interests.

[4-6] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Id.* The party seeking modification of child custody bears the burden of showing a material change in circumstances. *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004).

[7] Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

[8,9] According to Neb. Rev. Stat. § 43-2923(1) (Cum. Supp. 2012), the best interests of the child require a parenting

arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress. *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009). Section 43-2923(6) states:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . . and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to the statutory factors relating to the best interests of the child, a court may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension, regardless of chronological age, and when such child's preference is based on sound reasons; and the general health, welfare, and social behavior of the child. *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996).

[10] The Nebraska Supreme Court has explained that not every change warrants a change in custody and that "[t]he best

interests of the children are not served by constant custody disputes and a shifting of custody control from one parent to the other." *Hoschar v. Hoschar*, 220 Neb. 913, 915, 374 N.W.2d 64, 66 (1985), *disapproved on other grounds*, *Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989). The *Hoschar* court further stated that a decree fixing custody should not be modified "unless there has been a change of circumstances indicating that the person having custody is unfit for that purpose or that the best interests of the children require such action." *Id*.

[11] Nebraska courts have also held that evidence of the custodial parent's behavior during the year or so before the hearing on the motion to modify is of more significance than the behavior prior to that time. *Hoins v. Hoins*, 7 Neb. App. 564, 584 N.W.2d 480 (1998) (citing *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986), and *Hassenstab v. Hassenstab*, 6 Neb. App. 13, 570 N.W.2d 368 (1997)).

> The focus is on the best interests of the child now and in the immediate future, and how the custodial parent is behaving at the time of the modification hearing and shortly prior to the hearing is therefore of greater significance than past behavior when attempting to determine the best interests of the child.

*Hoins v. Hoins*, 7 Neb. App. at 569, 584 N.W.2d at 484.

In *Kennedy v. Kennedy, supra*, a district court modified custody from a mother to a father based on evidence that after the divorce, the mother had at different times cohabitated with two men to whom she was not married. The Nebraska Supreme Court reversed that decision. The *Kennedy* court pointed out that the mother had lived with her current husband for about 6 months prior to marrying him and that "[a]side from the fact that the parties lived together without first marrying, there is no evidence to indicate that the children were in any other way adversely affected by the relationship." 221 Neb. at 726, 380 N.W.2d at 302. In evaluating whether there had been a material change of circumstances for the district court to change custody, the *Kennedy* court concluded that other than the fact that the mother had at different times lived with three men at times she was not married to any of them,

there had been no significant material change in circumstances. The court also concluded that there was no evidence that the children were in any manner adversely affected by the living arrangements or exposed to any sexual activity. The *Kennedy* court stated:

> Where, as here, the evidence discloses that although the mother may have engaged in sexual activity with men not her husband when the children were home, absent a showing that the children were exposed to such activity or were in any manner damaged by reason of such activity, such sexual activity does not justify a change in custody.

221 Neb. at 727, 380 N.W.2d at 303. The *Kennedy* court also pointed out that just because the father now has a more stable home than at the time of the original order does not justify removing the children from the mother, noting that "'[t]he best interests of the children are not served by constant custody disputes and a shifting of custody control from one parent to the other. Rather, to the extent we can, we should attempt to provide some sense of stability for the children.'" *Id*. at 728, 380 N.W.2d at 303.

In *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996), a trial court modified custody of a child from the mother to the father. The Nebraska Supreme Court reversed that decision. Among other issues in that case, the mother admitted she had violated a provision of the dissolution decree which prohibited her from cohabitating with men not her husband. The *Smith-Helstrom* court noted:

> [V]iolation of a court decree is unquestionably a serious matter. But it is the best interests of the son which must be our paramount concern. While it is true that evidence concerning the moral fitness of the parents, including sexual conduct, can be considered as a factor in determining a child's best interests, . . . absent a showing that the mother's cohabitation adversely affected her son, we do not give this factor much weight.

249 Neb. at 460, 544 N.W.2d at 101 (citation omitted).

Of significance in our review of the district court's February 27, 2013, order in this case is its decision to consider a

number of matters occurring before the previous custody order was entered just a year earlier on February 22, 2012, as well as its decision to conduct an analysis on the removal issue before addressing the modification of custody issue. After concluding that Ember "has failed to carry the burden of establishing that moving Lillian to New York City is in Lillian's best interest," the trial court then addressed Andrew's request to change custody, noting that it was Andrew's burden to establish a material change in circumstances. Without providing any details, the trial court stated, "The court concludes that Andrew has met this burden. There has been a material change in circumstances since the last modification." The trial court then proceeded to analyze the best interests of the child, stating, "Ember's conduct as described above has been considered in reaching this decision to change custody. Further discussion of those facts is unnecessary." The trial court then proceeded to discuss the evidence adduced about Andrew and his wife, Holly.

[12] There is nothing in the record to indicate that in the year between the February 2012 custody order and the February 2013 custody order, there was any material change in circumstances adversely affecting Lillian's best interests. While it can be argued that Ember's decision to move to New York to live with Bannister after her divorce from Day might constitute a change in circumstances, there is no evidence to support that these changes had any adverse impact whatsoever on Lillian. In fact, there was substantial evidence to indicate that Lillian was flourishing in her new environment. However, the trial court elected to avoid consideration of that evidence, stating, "There was considerable evidence about Lillian's life in New York City. That evidence is, of course, relevant only if the court determines that the move is justified." The trial court then proceeded to first discuss the removal of Lillian from Iowa to New York, rather than to first evaluate whether a material change in circumstances affecting Lillian's best interests had occurred that would warrant a change in custody. The trial court did not consider Lillian's relationship with Ember, nor how happy and thriving Lillian appeared to be when she was with Ember; rather, the trial court focused more on the

fact that Ember moved without permission and viewed her lifestyle as less stable than Andrew's. However, not every change in the parties' circumstances justifies a change in custody. See *Youngberg v. Youngberg*, 193 Neb. 394, 227 N.W.2d 396 (1975). Instead, in order to find that a material change in circumstances has occurred, the changes in the parties' circumstances must be significant enough to have affected the best interests of the children involved. See *id*.

In this case, the trial court essentially based the change in custody on Ember's failure to obtain Andrew's and/or the trial court's permission to move before actually moving to New York. The trial court stated:

> Ember's email has been demonstrated to be nothing more than a rather blatant effort at manipulation. . . . Had Ember truly cared for Andrew's input she would have been honest about her desire to move to New York City three months earlier and given him an opportunity to truly consider possible schools. . . . Ember's actions were designed to prevent Andrew from seeking a court decision in advance of the move.

Although there is no doubt that an earlier discussion of a desire to move to New York City would have put Ember in a more favorable light, Ember's testimony that she waited until Lillian was back in her care before telling Andrew about moving to New York, based on "what happened the last time I requested permission to move out of state," was understandable in light of Andrew's filing for ex parte emergency custody the last time she talked to him about moving (to Iowa). And in fact, in this case, upon sending the e-mail on August 30, 2012, rather than responding or attempting to discuss the matter in any manner, Andrew filed a lawsuit to change custody within the next week.

In *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996), the Nebraska Supreme Court considered the mother's violation of a provision of the dissolution decree which prohibited her from cohabitating with men not her husband and concluded that absent a showing that the violation (cohabitation) adversely affected her child, it would not give that factor much weight. We agree with the *Smith-Helstrom* court that

a violation of a court order is a serious matter, but that our paramount concern must be the best interests of Lillian. There is no evidence to indicate that Lillian was adversely impacted by the move to New York in any way; in fact, all of the evidence shows that Lillian was doing well in school, had a lot of friends to play with, was happy with the people around her and her activities, and was "calm and secure and happy." Her reading had improved, she was in afterschool programs for science and singing, and she was attending creative dance class at Mark Morris Dance Center. According to Ember, Lillian's aptitude for dance was shown in Decorah, where a teacher there recommended private lessons. Upon moving to New York City, Ember enrolled Lillian at Mark Morris Dance Center and walks Lillian and a friend to class every Wednesday. Ember also enrolled Lillian in music lessons from a violinist/composer, who comes to Ember's home once a week to give violin and piano lessons and to also teach music theory.

The evidence presented at the modification hearing revealed that despite the moves in Ember's life, Lillian is generally a happy, healthy, and well-adjusted young child. Her mother's musical influence can be seen in Lillian's preference for listening to Beethoven's Violin Concerto in D during breakfast before school. According to Bannister, Lillian resists almost any other suggestion for breakfast music and they respect Lillian's preference for a melodic keyboard composition at bedtime. There is no cable television in Bannister's apartment, and Ember limits Lillian's time that "she can watch a DVD or be on the PBS Kids site" on the computer to weekend mornings only. At the time of the hearing, Ember had been Lillian's primary caregiver for over 5 years, during which time Lillian by all accounts has thrived. As discussed previously, since the move to New York, Lillian has done well in kindergarten and has begun music and dance lessons. Andrew did not present any specific evidence that the changes in Ember's life have had a negative impact on Lillian.

It is clear from the record that both parents love Lillian and that they have each generally provided for her safety, health, and physical care. Lillian appears to have a close relationship with both parents, and there is no evidence of abuse inflicted

by either parent. These facts have not changed since the entry of the previous order. While Andrew presented evidence of his greater stability than Ember with respect to his residence, family, and employment, such evidence in itself is insufficient to justify a change in custody. As set forth in *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986), just because a parent now has a more stable home than at the time of the original order does not justify changing custody. Stability in this case required leaving Lillian in Ember's primary care where she had been for more than 5 years prior; stability should not be based solely upon a parent's relocation. If that were the case, custodial parents who have to move due to business, military, or other such transfers would be subject to constant modification actions because of relocations mandated by their jobs. It is particularly unfair in this case to remove Lillian from Ember's primary care when Ember has now found a way to be at home with Lillian more while still having opportunities to advance her music career. Looking at the best interests factors listed in § 43-2923(6), the factors relevant in this case are subsections "(a) [t]he relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing" and "(c) [t]he the general health, welfare, and social behavior of the minor child." There is absolutely no evidence to suggest that Ember and Lillian have anything but a loving and healthy parent-child relationship or that Lillian is lacking in proper parental care. After reviewing the record, although the move to New York may constitute a change in circumstances occurring since the last custody order, Andrew has failed to establish that those changes had any adverse impact on Lillian's best interests or that her best interests warrant a change in custody. Accordingly, we find that the district court abused its discretion in modifying Lillian's primary physical custody from Ember to Andrew.

## 2. Denial of Application to Remove Lillian to New York

[13] In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy

the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002); *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012).

This case presents an unusual factual situation as it relates to the removal jurisprudence. While the Nebraska court has continued to exercise jurisdiction in this case (with the parties' agreement), neither parent resides in Nebraska. Ember previously resided in Nebraska but was granted permission to move to Iowa in the last modification order, and she now resides in New York. Andrew has never resided in Nebraska; rather, he has continuously resided in the Kansas City area since the inception of this action. Without acknowledging the unusual factual scenario in this case, the district court applied the above test for removal and concluded that Ember's application to remove Lillian should be denied. However, the court did not apply the entirety of that test in its order. Our review shows that the court's order omits analysis of the first factor—whether Ember had a legitimate reason to leave the state.

On appeal, Ember questions whether this part of the test should even apply to her case. She notes in her brief that the requirement for her to establish a legitimate reason for leaving the state may not apply in this case because of the "large geographic distance that already existed between the parties" while she lived with Lillian in Iowa and Andrew lived in Missouri. Brief for appellant at 21. Ember further argues that there should be no need for her to prove a legitimate reason to move from a state in which the noncustodial parent does not reside.

We note that the above test for removal was first established by the Nebraska Supreme Court in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Since its inception, this test has been applied to numerous cases. Although many of these applications have occurred in situations in which both parents were residing in Nebraska, this court has held that the

test from *Farnsworth* applies when a court considers a cus-
todial parent's request for permission to make a subsequent
move to yet another state. *Maranville v. Dworak*, 17 Neb.
App. 245, 758 N.W.2d 70 (2008). In addition, the Nebraska
Supreme Court recently considered the *Farnsworth* analysis
in a situation where the noncustodial parent did not reside
in Nebraska but nevertheless sought to prevent the custodial
parent from relocating from Nebraska to Texas. See *Steffy
v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014) (relocation
denial by district court upheld under plain error analysis). In
*Steffy*, the Nebraska Supreme Court chose not to address the
threshold question of whether the custodial parent had a legiti-
mate reason to relocate, because its holding on best interests
was dispositive. Nonetheless, Nebraska appellate courts have
not considered whether this test (in particular the existence of
a legitimate reason to relocate) should be applied in the present
factual scenario—when neither parent lives in this state and
the noncustodial parent is attempting to prevent the custodial
parent's subsequent move to another state.

Having reviewed the facts of this case and the applicable
law, we agree with Ember that this case does not present the
traditional application of *Farnsworth*. However, we need not
determine whether the test should be different in this case,
because we conclude that application of the *Farnsworth* test,
in its current form, would not alter the ultimate outcome of the
case. Applying the *Farnsworth* test in its entirety, we conclude
the district court erred when it denied Ember's application to
remove Lillian.

### (a) Legitimate Reason to Leave State

Ember testified that in light of her separation from Day
in June 2012, she no longer had a home in which to live
in Decorah, where she and Day had been living with Day's
parents. Ember had been working two part-time jobs in
Decorah, neither of which were career-related jobs. She did
not consider moving back to Nebraska because the only fam-
ily remaining there was Chesley, her adoptive mother, from
whom she had been estranged for 2 years. Although she had

friends in Lincoln, Ember decided Philadelphia or New York City seemed to be the best options for her and Lillian. After spending some time in Philadelphia and having a Philadelphia record label put out her second full-length album, Ember learned the schools there were not very good, whereas she understood the New York public schools were "some of the best in the country." Ember also had many musician friends in New York who had children, and after she and Bannister started a romantic relationship in the summer of 2012, they discussed Ember's moving in with him. While concerns about Ember's living with and being supported by a man not yet divorced from his estranged wife are understandable, we do not see these concerns as a basis to conclude that her request to move to New York was illegitimate. Rather, in our opinion, the focus should be on whether it was legitimate for Ember to seek to move from Iowa to New York. We conclude that Ember's reasons to move to New York were legitimate, because they were based on her desire to continue enhancing her music career while also making more time to be at home with Lillian.

[14,15] Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state. *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009); *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). Such legitimate employment opportunities may constitute a legitimate reason when there is a reasonable expectation of improvement in the career or occupation of the custodial parent. *Id*. Ember testified that the move to New York would be beneficial for her music career because she can accomplish more in New York than she could have in Iowa and because her performances in New York have had "a lot more impact" for her career.

In *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000), the mother requested to move from Nebraska to Pittsburgh, Pennsylvania, because she had extended family there and also believed that she could enhance her employment opportunities. As it turned out, she earned less money in Pittsburgh, but there was greater potential for salary advancement at the Pittsburgh job. The mother testified that there was also less

overtime required of her in Pittsburgh, which in turn allowed her to spend more time with the children. The Nebraska Supreme Court concluded that there was sufficient evidence that although the mother's Pittsburgh job did not pay as well as her prior Nebraska job, the mother had a reasonable expectation for improvement in her career. The same can be said in the instant case for Ember's expectations of career opportunities and advancement in New York versus Iowa. Ember testified that living in Iowa required her to be gone for extended overnights in order to do performances, while maintaining that performances and music opportunities in New York did not require her to be gone overnight and that the "shows that I do play have a lot more impact for me."

In *Kalkowski v. Kalkowski*, 258 Neb. 1035, 1046, 607 N.W.2d 517, 526 (2000), the Nebraska Supreme Court concluded a mother's wish to relocate to Canada to be near extended family and to pursue educational and employment opportunities there were legitimate even though the mother "did not investigate educational opportunities in Nebraska and conducted only a limited investigation of employment opportunities in this state." In Ember's case, she specifically testified to the advantages of pursuing her career in New York over staying in Iowa, where she worked two jobs not related to her music career and had to be away for extended overnights in order to perform. Ember's reasonable expectation of improvement in her music career by moving to New York is a legitimate reason to request to move there.

Because we conclude a legitimate reason exists for the move, it is not necessary to address Ember's argument that this factor need not be considered in light of the fact that both parties live in separate states outside of Nebraska. Accordingly, the next analysis is whether it is in Lillian's best interests to continue living with Ember in New York.

### (b) Best Interests

[16] In determining whether removal to another jurisdiction is in the child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential the move holds for enhancing the quality of

life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in light of reasonable visitation. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

### *(i) Each Parent's Motives*

[17] The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin, supra*; *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012).

The record shows that Ember sought removal after she divorced Day and could no longer reside with Day's parents in Iowa. Ember was in a position where she had to move from her residence in Iowa and needed to make decisions about relocation. After considering Philadelphia and New York City, she decided New York was the best location based on career opportunities for herself and educational and cultural opportunities for Lillian. Ember offered to pay for Lillian's travel costs in order for Andrew to maintain the same level of parenting time. Ember's delay in notifying Andrew about moving to New York and her failure to get court approval first are discussed in the custody portion of the opinion and will not be repeated here. The trial court's statement, "Ember's motive in making the move is unclear," is not supported by the evidence. Rather, the evidence showed that she could no longer live with Day's parents and that her reasons for selecting New York as a point of relocation were reasonable given her aspirations as a musician. Andrew opposed this move, stating, "I don't think [New York City] is the neighborhood that I want my daughter growing up in," and he also had concerns about Ember's moving from place to place and the "inconsistencies of living a nomadic life."

We conclude that neither party in this case acted in a way to intentionally frustrate or manipulate the other. Little weight is attributed to this factor.

### (ii) Potential for Enhancing
### Quality of Life

[18,19] In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013). See *McLaughlin v. McLaughlin, supra*. This list should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted. *Dragon v. Dragon, supra*. See *McLaughlin v. McLaughlin, supra*.

### a. Emotional, Physical, and Developmental
### Needs of Child

Having reviewed the record, we conclude this factor weighs quite heavily in favor of removal. The trial court found that Ember's "repeated moving among relationships and geographic areas is not beneficial to Lillian's emotional or developmental needs" and that "[t]his particular move was done without sufficient recognition of the emotional impact on Lillian." However, the trial court also acknowledged:

> There is evidence that Lillian's development in musical areas may be enhanced by this move. In New York City she is surrounded by cultural influences which would be beneficial to her upbringing. It is certainly beneficial that she is surrounded by people who are not glued to a television set.

The trial court did not indicate if the weighting tipped one way or the other after indicating both negative and positive reasons related to this factor. We note that Lillian had primarily lived with Ember for all of her life and that all evidence pointed to Lillian's being a very well-adjusted, happy, and creative child. When considering the best interests of a child, in our opinion, the emotional and developmental stability of the child should not be determined solely or primarily by where they are living or the number of times they may have to move; rather, these factors are primarily influenced by the relationships with people involved in the child's life, most of all familial relationships, but also friends, schoolmates, teachers, and other regular contacts in that child's life. In this case, all of the evidence indicated a happy and outgoing child doing well in school and in her music and dance activities. This evidence all points to her emotional, physical, and developmental needs being more than satisfactorily met while having lived primarily in Ember's care. We see this factor as being one of the most significant factors to consider, and we assign it considerable weight in considering Lillian's best interests.

### b. Child's Opinion or Preference

There is no evidence in the record to establish Lillian's opinion or preference, and this factor therefore does not weigh in favor of or against removal.

### c. Enhancement of Custodial Parent's Income or Employment

The trial court stated that "Ember's income and employment have not been shown to be positively enhanced by the move." We disagree for the same reasons set forth in the discussion on whether Ember had a legitimate reason to move to New York. It is not just a matter of increased earnings. Ember's ability to stay at home with Lillian, walk her to and from school, and engage in more of Lillian's day-to-day activities is a significant advantage for Lillian. Ember's ability to enhance her own music career without extended overnight traveling is likewise an advantage for Lillian. Requiring a musician who has shown success in the industry to stay in Iowa, Nebraska,

or Missouri seems an inappropriate infringement of that parent's "right to travel between states and the right to 'migrate, resettle, find a new job, and start a new life.' We have stated that an award of custody is not and should not be a sentence of immobilization." *Daniels v. Maldonado-Morin*, 288 Neb. 240, 243, 847 N.W.2d 79, 82 (2014) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), *overruled on other grounds, Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)). We conclude this factor weighs in favor of removal.

### d. Degree to Which Housing or Living Conditions Would Be Improved

The trial court found that Ember failed to carry her "burden of establishing any improvement in housing or living conditions," because there was no evidence of housing or living conditions while Ember was still living with Day versus after she separated from Day. We find there is insufficient evidence to compare the living conditions in Iowa to those in New York, and accordingly, we find this factor does not weigh in favor of or against removal.

### e. Existence of Educational Advantages

The trial court concluded that "[w]hile the educational opportunities are different in New York City compared to Iowa, there is no evidence a New York City education is more advantageous to Lillian compared to an Iowa education." However, the trial court also noted, "Lillian's musical talents have thrived recently. However, it is not clear whether that is a function of New York City, or merely a function of Lillian's age." We agree with the trial court that there was insufficient evidence to compare an Iowa education to a New York education and that simply based on a comparison of school systems, there was insufficient evidence to weigh in favor of or against removal on that factor.

However, the evidence also showed that Lillian was able to start kindergarten at a younger age in New York and that she was able to participate in dance instruction and private music lessons in New York City, where her musical abilities

have flourished—as noted by the trial judge. There was also evidence of greater musical and cultural opportunities available to Lillian in New York City, such as the Metropolitan Museum of Art, which she visited a couple of times; the Brooklyn Museum, displaying art and artifacts; a new natural history museum; and the Mark Morris Dance Center. For those reasons, we would find that this factor slightly favors removal.

### f. Quality of Relationship Between Child and Each Parent

On this factor, the trial court stated, "Lillian appears to have a good relationship with both parents. It is clearly a different relationship with each parent." We agree with the trial court the record shows that Lillian has a good relationship with each parent and that Ember has been the custodial parent for the majority of Lillian's life, while Andrew has exercised his allocated parenting time.

We conclude that Ember's being the primary custodial parent for all of Lillian's life weighs in favor of her continuing to primarily reside with Ember. When, by all indications, Lillian was thriving under Ember's primary care, that relationship should not be disrupted by a change in physical custody. "'The best interests of the children are not served by constant custody disputes and a shifting of custody control from one parent to the other. Rather, to the extent we can, we should attempt to provide some sense of stability for the children.'" *Kennedy v. Kennedy*, 221 Neb. 724, 728, 380 N.W.2d 300, 303 (1986). Continuing to primarily reside with Ember would be in Lillian's best interests in order to preserve that primary parent-child relationship, which the evidence shows has produced a healthy, thriving child.

### g. Strength of Child's Ties to Present Community and Extended Family

The record shows that Lillian and Ember do not currently have any family ties in Iowa, nor had Lillian commenced school when removal was requested. There was absolutely nothing to tie Lillian to Decorah. Although Ember retained

friends in the Lincoln area, the only family connection in
Nebraska was with Chesley in North Platte, from whom Ember
had been estranged for 2 years. Ember has no family ties to
Missouri. Andrew presented evidence of an extensive extended
family network near the Kansas City area, and he argued that
the considerable distance created by the removal would make
it more difficult for Lillian to have these relationships. The
trial court opined that "[a] move to New York makes it much
more difficult for Lillian to have a relationship with other fam-
ily members." However, those other family relationships were
built despite the distance from Kansas City to Decorah or, pre-
viously, Lincoln. Andrew has never lived in the same commu-
nity with Lillian and Ember, so traveling to spend time together
is not a new challenge. Andrew admitted that he made no trips
to Decorah for additional parenting time with Lillian. Given
that Lillian has built relationships with Andrew's extended
family in the Kansas City area while she was there during
designated parenting times establishes that distance alone does
not impact the ability to maintain such relationships. Given that
neither Ember, Lillian, nor Andrew had any ties to Decorah,
this factor weighs in favor of removal.

### h. Likelihood That Allowing or Denying
### Move Would Antagonize Hostilities
### Between Parties

We agree with the trial court that there is no evidence in the
record to suggest hostilities would be antagonized between the
parties whatever the outcome, and this factor therefore does
not have any weight in the removal analysis.

### (iii) Impact on Noncustodial Parent
### in Light of Reasonable Visitation

As discussed above, Andrew has never lived in the same
state as Ember and Lillian. Traveling distance has always been
a necessary component to Andrew's exercising parenting time
with Lillian. That has usually involved Andrew's or both par-
ties' having to drive a good distance to facilitate parenting
exchanges. Ember testified that with her moving to New York,
the current parenting schedule could be maintained with the

exception of Andrew's parenting time on Lillian's birthday weekend. Ember proposed that this time be added to Andrew's parenting time in the summer. Ember proposed that she would take responsibility for transporting Lillian to Andrew for his parenting time and would be responsible for associated costs. Andrew argued that if Lillian lived in New York, it would no longer be feasible for him to drive to see her at any events that were outside his parenting time. However, he conceded that he never went to Decorah to see Lillian during the time she lived there, but explained that this was because she was "never in school." He acknowledged that Ember had provided him with some contacts to obtain information related to programs at the Montessori daycare Lillian was attending there. Ember testified that Lillian was in a dance class in Decorah and that she had told Andrew about a recital; however, Andrew never went to visit Lillian in Decorah.

There is no question that putting more miles between residences makes driving for parenting time less feasible, although not impossible. There was evidence in the record that Chesley, Lillian's grandmother, traveled (presumably drove, based on the number of days of travel) to New York City and took photographs of Ember's neighborhood on Lillian's birthday, shortly after a hurricane had hit parts of New York. The trial judge concluded, "If the move were approved, Andrew would no longer be able to pack the family in a car and drive to one of Lillian's school event's [sic] or a dance or violin recital." The trial judge further concluded, "Andrew and Lillian will never be able to be together for her birthday celebration. Those opportunities are gone." First of all, as noted previously, Andrew never "pack[ed] the family in a car" to drive to see Lillian in an activity when she was in a more manageable driving distance. Second, a family road trip can still be made for special events if desired; clearly, Chesley was willing to drive that distance, even without having made advanced arrangements to see Lillian on her birthday. As to enjoying a birthday with Lillian, there is no reason a parenting schedule could not address this; these opportunities are not just "gone." Although making arrangements will require greater cooperation, coordination, and flexibility between the parents, there

is no reason Andrew should have any less parenting time than previously available to him; it may just come in fewer, but longer, periods of time.

Due to there being no change to the amount of time Andrew can spend with Lillian, and in light of Ember's being willing to take responsibility for travel costs, we conclude this factor weighs neither in favor of nor against removal.

### (iv) Conclusion on Move

In considering the factors above, all factors either weighed in favor of removal or were neutral. The weight of the evidence supports the move's being in Lillian's best interests. Ember has shown that she has a legitimate reason to move to New York and that such a move is in Lillian's best interests. Accordingly, we reverse the district court's decision denying Ember's request to move to New York with Lillian, and remand the cause for entry of an order (1) granting permission for the move, (2) revising the parenting plan to switch Andrew's and Ember's parenting time accordingly, and (3) requiring Ember to be responsible for the costs associated with transporting Lillian to and from Andrew for his scheduled parenting time.

### 3. Chesley's Visitation With Lillian

As noted above, Chesley is Ember's mother by adoption. Chesley had a significant relationship with Lillian after she was born. In fact, Chesley cared for Lillian for extended periods of time at her home in North Platte from 2008 through 2010 while Ember was on tour. However, Chesley's relationship with Ember soured when she informed Ember that she could not care for Lillian in January 2011 for the extended period of time Ember requested. Chesley testified that Ember reacted poorly to this refusal and that she has not seen Ember much since that time. Chesley also testified that she and her husband attempted to visit Ember and Lillian in New York City just after a hurricane occurred to make sure they were safe, but they were not able to make contact with Ember in spite of numerous efforts.

Ember contradicted Chesley's version of the events and argued that Chesley acted irrationally in January 2011. Ember

claimed that when she tried to leave with Lillian after a visit, Chesley became overly emotional and tried to take Lillian from her. Ember also stated that she and Lillian were not in any danger during the hurricane, because Bannister's apartment was on high ground. Ember became distressed and afraid when she learned that Chesley was attempting to visit her in New York City.

When Andrew and Ember reached agreement on a revised parenting plan in February 2012, they included a provision that Chesley was not to have any unsupervised contact with Lillian. Andrew testified at trial that he allowed this provision because of what he learned about Chesley from Ember. While this parenting plan was in effect, however, Andrew and his family developed a relationship with Chesley. He supervised a number of visits between Chesley and Lillian and concluded that Ember's concerns were unfounded. Andrew requested that the court lift the supervised contact restriction. As additional support for this request, Andrew also submitted a psychological evaluation of Chesley in which the psychologist concluded that she would be a dependable, stable, and loving influence in all of her relationships and unlikely to harm anyone.

The district court determined that there was no evidence to justify continuing Chesley's visitation restriction and vacated that part of the previous order. We agree with that conclusion. Although Ember may still not want a relationship with Chesley, there is nothing in the record to show that she is a bad influence in Lillian's life or that she is an unsafe person. The district court did not abuse its discretion when it lifted this restriction. This assigned error is without merit.

### 4. Child Support Modification

In her final assignment of error, Ember argues that the district court abused its discretion when it modified her child support obligation. Although we have found that the district court abused its discretion in modifying custody, because child support was due Andrew while Lillian was in his custody, we address this issue. However, consistent with our reversal of the custody modification, we remand the cause to the district court

with directions to enter an order terminating Ember's child support obligation and ordering payment of child support by Andrew, based upon the worksheet attached to the February 2013 order, to commence upon the first day of the month following the return of Lillian's custody to Ember.

Specifically, Ember contends that the court erred in using her earning capacity from 2009 to determine child support when the evidence at trial showed that she has earned minimal income since her move from Iowa to New York.

When the court determined child support in its order, it utilized the parties' 2009 total monthly incomes as reflected in the original paternity order and attached child support worksheet, since it noted that neither party had proposed a change to the child support calculation used in the 2009 order. Accordingly, the court assigned total monthly income of $1,733 to Andrew and $1,790 to Ember. The court utilized these incomes because it did not find any evidence that the parties' income or earning capacity had changed since 2009. The court also made adjustments to its calculations by reflecting Andrew's payment of Lillian's health insurance and granting Ember a deviation because of the transportation costs she will incur in exercising her parenting time with Lillian.

Andrew did not present any evidence of his current income at trial. Ember presented evidence that she earned $8,000 in 2012; however, this appears to be income earned in Iowa before her move to New York. Ember currently has no income and has voluntarily become a stay-at-home mother since moving to New York, consciously choosing to rely on Bannister for her housing and living expenses and on Andrew for child support.

[20-23] The Nebraska Child Support Guidelines provide that earning capacity may be considered in lieu of a parent's actual, present income when the circumstances merit. See Neb. Ct. R. § 4-204. Earning capacity may include factors such as work history, education, occupational skills, and job opportunities. *Id*. Earning capacity should be used in determining a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Johnson v. Johnson*, 20 Neb. App. 895, 834 N.W.2d

812 (2013). When the evidence demonstrates that the parent is unable to realize a particular earning capacity by reasonable efforts, it is clearly untenable for the trial court to attribute that earning capacity to the parent for purposes of determining child support. *Id*. A reduction in child support is not warranted when an obligor parent's financial position diminishes due to his or her own voluntary wastage or dissipation of his or her talents and assets and a reduction in child support would seriously impair the needs of the children. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009).

We conclude that the district court did not abuse its discretion when it calculated the parties' child support based on their 2009 incomes. Because Ember has voluntarily chosen not to work in New York in a manner that would provide her with monthly income, her 2009 income reflects the best evidence of her earning capacity. There is no evidence that Ember is unable to work or to show that she could not achieve the same level of income, through reasonable efforts in New York, as she earned in 2009. This assigned error is without merit.

## V. CONCLUSION

Because the district court abused its discretion in modifying Lillian's primary physical custody from Ember to Andrew, we reverse that portion of the district court's order and restore primary physical custody to Ember. We also reverse the district court's denial of Ember's request to move to New York with Lillian and direct the district court to enter an order granting permission for the move. We also direct the court to revise the parenting plan, switching Andrew's and Ember's parenting time accordingly and requiring Ember to be responsible for the costs associated with transporting Lillian to and from Andrew for his scheduled parenting time.

However, the district court did not abuse its discretion when it removed Chesley's visitation restriction and calculated Ember's child support during the period that Lillian has been in Andrew's custody. We remand the cause to the district court with directions to enter an order terminating Ember's child support obligation and ordering payment of child support by Andrew, based upon the worksheet attached to the February

2013 order, to commence upon the first day of the month following the return of Lillian to Ember's custody.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

MOORE, Judge, concurring in part, and in part dissenting.

I respectfully disagree with the conclusion of the majority that the district court abused its discretion in modifying Lillian's custody from Ember to Andrew. Based upon my de novo review of the record, I agree with the district court that a material change in circumstances has occurred since the entry of the previous order of modification and that it is now in the best interests of Lillian to place her custody with Andrew. I also disagree with the majority's finding that the district court abused its discretion with respect to the denial of Ember's request to move Lillian to the State of New York. Based upon my de novo review of the record, not only did Ember fail to establish a legitimate reason to move Lillian to New York, but she also failed to show that it was in Lillian's best interests to move there.

## I. STANDARD OF REVIEW

As a starting point, I refer again to our standard of review which I believe significantly controls the outcome in this case. Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.* Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Collins v. Collins*, 21 Neb. App. 161, 837 N.W.2d

573 (2013). In fact, in contested custody cases, where material issues of fact are in dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. *Id*.

With respect to parental relocation cases, the Nebraska Supreme Court has recently recognized:

> In parental relocation cases, trial and appellate courts deal with the tension created by a mobile society and the problems associated with uprooting children from stable environments. Courts are required to balance the noncustodial parent's desire to maintain their current involvement in the child's life with the custodial parent's chance to embark on a new or better life. These issues are among the most difficult issues that courts face in postdivorce proceedings. It is for this reason that such determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given deference.

*Steffy v. Steffy*, 287 Neb. 529, 537, 843 N.W.2d 655, 662-63 (2014). And, as noted by Justice Stephan in his dissenting opinion in *McLaughlin v. McLaughlin*, 264 Neb. 232, 246, 647 N.W.2d 577, 592 (2002):

> Where, as in this case, there are no absolutes and no clearly right or clearly wrong answers, it is particularly important to bear in mind that our standard of review requires an appellate court to give deference to the discretion of the trial judge, who observed the demeanor of the witnesses as he or she heard their testimony.

## II. MODIFICATION OF CUSTODY

### 1. Material Change in Circumstances

The trial court found that Andrew met his burden of establishing a material change in circumstances since the last modification order. The majority recognizes that Ember's decision to move to New York to live with Bannister after her divorce from Day *might* constitute a change in circumstances since the last custody order, but I believe that it fails to recognize

the extreme nature of this change. Rather, the majority rests its decision on the lack of concrete evidence that Lillian has been harmed in any visible way by this extreme change. In my opinion, the fact that Ember—less than 4 months after the February 2012 order was entered—separated from Day, left Iowa for the east coast without a job or solid housing, moved in with a married man nearly twice her age, and then moved Lillian into this situation without notifying Andrew, let alone seeking court approval, clearly constitutes a material change in circumstances.

The majority downplays Ember's blatant violation of the previous court order and suggests that the previous attempt by Andrew to gain custody of Lillian when Ember moved to Iowa without court approval somehow justifies this conduct. And the majority suggests that Ember's fears were realized (and therefore justified) when Andrew again sought custody in this proceeding. Certainly, Andrew should not be criticized for instituting this modification action after Ember again took matters into her own hands and moved Lillian halfway across the country, and certainly, such action by Ember should not be condoned. Less than 4 months before Ember left Iowa for the east coast, she agreed (1) that she would share joint legal custody of Lillian with Andrew; (2) that she would discuss with Andrew decisions concerning the parenting of Lillian; (3) that she would reside in the states of Nebraska, Missouri (including the Kansas City area), or Iowa unless otherwise agreed to by the parties; and (4) that the terms of the parenting plan could be temporarily changed as long as both parents agree in writing, but that any permanent changes to the plan required court approval before the change would become binding and enforceable. Clearly, Ember knew the significance of this agreement and her breach thereof, having been down the modification road so recently. The only conclusion that can be reached, in my opinion, is that she willfully chose to ignore the agreement and court order. Had the trial court, in February 2012, known that Ember was going to leave Iowa for the east coast 4 months later to secure a new living arrangement and support system and remove Lillian to New York, I strongly believe that it would have decreed differently.

### 2. BEST INTERESTS

Nevertheless, Ember's actions in defying the court order cannot solely form the basis for modification of custody. It is well established that in order to modify custody, there must also be evidence that the change in circumstances affects the best interests of the child. See *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004). In support of its finding that Lillian's best interests require returning her custody to Ember, the majority places much emphasis on the fact that Lillian has been "flourishing" in New York City since being moved there. Ember's evidence was that Lillian started kindergarten, attends afterschool programs, attends creative dance class at Mark Morris Dance Center, and has private music lessons. However, it is important to note that the evidence concerning Lillian's life in New York City was only developed as a result of Ember's unilateral decision to move Lillian there before obtaining either Andrew's consent or prior court approval. Both the Nebraska Supreme Court and this court have discussed this evidentiary conundrum in connection with the grant of temporary permission to remove children to another jurisdiction prior to ruling on the issue of permanent removal, which practice has been specifically discouraged. See, *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). This court summarized the *Jack v. Clinton* discussion, stating:

> [U]nnecessary and unfortunate complications . . . arise when a trial court grants a motion for temporary removal of a minor pending resolution of an application for permanent removal. In addition to necessarily causing the record to include facts pertaining to the periods prior to and after relocation, an ultimate denial of the application for permanent removal will necessitate ordering the minor, who may have already recently adjusted to one move, to move again and return to the jurisdiction. . . . The Supreme Court held, "The grant of temporary permission to remove children to another jurisdiction complicates matters and makes more problematic the subsequent ruling on permanent removal and encumbers

appellate evaluation of the ultimate decision on perma-
nent removal."

*Wild v. Wild*, 15 Neb. App. at 735, 737 N.W.2d at 897.

In the case before us, it was Ember, not the trial court, who
caused this "unnecessary and unfortunate complication" by
unilaterally removing Lillian to a new jurisdiction, thus allow-
ing Ember to adduce evidence of the results of Lillian's experi-
ence during the approximately 6 months that she was in New
York before trial. Not only should this practice of absconding
with a child to a new jurisdiction be discouraged, it should
not be allowed to form the basis for a finding regarding best
interests as it relates to either the custody modification decision
or the removal decision. Thus, I would discount the evidence
presented by Ember, that Lillian is "flourishing" since being
moved to New York, in analyzing her best interests.

The majority substantially bases its decision on best inter-
ests by finding there was no evidence to support that any
change in circumstances had an adverse effect upon Lillian.
Admittedly, there is no evidence of any physical harm or any
outward manifestation of emotional harm to Lillian during
the 6 months between her moving to New York and the trial.
Although Andrew was able to exercise his Christmas parent-
ing time in Kansas City, he was not able to have any personal
contact with Lillian in New York during this period of time or
make any investigation into her living situation. Neither parent
presented any expert testimony relating to the effect of this
move on Lillian. Rather, the evidence of her "flourishing" in
New York came solely from Ember, Bannister, and a friend of
Bannister. Again, I believe that this evidence should be dis-
counted as discussed above.

I further disagree that it is essential to a modification of
custody that an adverse impact from a material change in
circumstances must be explicitly shown by the evidence to
the exclusion of the other relevant factors in determining
best interests of a child. In addition, I believe that a trial
court, and an appellate court, can find adverse impacts by
implication from a review of the record. In other words, by
evaluating the relevant best interests factors and choosing to

modify custody, a trial court can essentially find by implication that the change in circumstances has an adverse impact upon the child.

In our recent decision in *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), we were presented with a somewhat similar situation to the case at hand. In that case, the parents of the two minor children were not married and originally agreed that the mother would have primary physical custody, subject to the father's parenting time. Both parents subsequently married others and had additional children. Several years later, the father sought modification of custody. At the outset of the modification proceedings, the mother attempted to move the children from Nebraska to Colorado despite the father's objection, but she returned to Nebraska after an ex parte order modifying custody was entered, and the children were returned to her custody pending trial. The evidence at trial showed that the mother had frequently changed residences and employment since the original custody agreement. After the mother's marriage, she relied upon her husband to help her care for the children, but at the time of trial, she was separated from her husband and planning to get a divorce. She had convictions for domestic assault (relating to her husband), possession of marijuana, failure to appear, issuing a bad check, and disturbing the peace (twice), and she had recently been charged with driving under the influence. There was some evidence that the mother was spending time in bars rather than caring for the children. She was working part time, but only because she felt she had to "'to please the court's,'" and she preferred to stay home with her children. *Id.* at 421, 838 N.W.2d at 361. The children had numerous absences and tardies from school during the year prior to trial while in the mother's care, but there was no evidence that their schoolwork had been negatively affected. The evidence concerning the father, on the other hand, showed that he had steady employment and housing and demonstrated stability in his marriage.

The trial court in *Kyle E.* modified custody by awarding primary physical custody to the father, and we affirmed. We first concluded that the totality of the evidence amounted to a

material change in circumstances which had affected the children's best interests. In reaching this conclusion, we noted the evidence concerning the mother's lifestyle in the last couple of years, and "consequently the lifestyle to which these children are exposed," finding that such evidence presented a legitimate concern regarding their custody. *Id*. at 422, 838 N.W.2d at 361. We also noted the evidence demonstrating the father's stable lifestyle. After considering the best interests of the children under Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2012) and related case law, we agreed that the best interests of the children would be served by being placed in the father's custody. We acknowledged this was a close case in that the children were "'typical, healthy, well-adjusted children'" thriving in the mother's care and that both parents "'enjoy a positive and healthy relationship with the minor children.'" *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. at 423, 838 N.W.2d at 362. Nevertheless, we concluded that the father was able to offer a more stable environment for the children when compared to the mother's past conduct and current living situation. In reaching this conclusion, we gave deference to the fact that the trial judge heard and observed the witnesses and was in a better position to determine the credibility of the parties.

Thus, while there was no explicit evidence that the children had been adversely affected by the mother's conduct and the change in circumstances since entry of the previous custody order, as noted by the dissenting opinion, the majority concluded that the best interests analysis nevertheless supported a modification of custody. See *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013) (Irwin, Judge, dissenting). The petition for further review was subsequently denied by the Supreme Court.

As noted in *Kyle E.*, the relative stability of the parents is an appropriate consideration in determining custody. See, also, § 43-2923(1) (stability in parenting arrangement is factor in determining best interests of child). In the instant case, a review of Ember's actions since the previous modification order reveals a continuing pattern of instability. While this evidence supports a finding of a material change in

circumstances as I concluded above, I believe it also speaks to Ember's judgment, which, albeit indirectly, speaks to her suitability as a custodial parent.

The prior modification order resulted from Ember's move from Nebraska to Iowa with a boyfriend due to financial difficulties she was experiencing. Although Ember married this boyfriend, this marriage lasted only a short time. When Ember's marriage ended, she found herself without a means of financial support and housing. Ember then decided that she would seek a new living arrangement and support system on the east coast, focusing on her music career. Ember picked Lillian up in Des Moines at the conclusion of the summer in 2012 without making any mention to Andrew that Ember had moved to New York or that she was taking Lillian there. Ember met Bannister in 2011 and began a romantic relationship with him, a married man nearly twice her age, on the same day that she separated from her husband in 2012. She moved in with Bannister within 2 to 3 months of beginning this romantic relationship and moved Lillian into Bannister's apartment and life without Lillian's having previously met him. In my opinion, this conduct of Ember shows great instability and poor judgment, which certainly affects Lillian's best interests.

The majority points to case law that indicates that cohabitation by a custodial parent does not necessarily support a modification of custody. See, *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996); *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986). I agree that cohabitation alone does not amount to a material change in circumstances. However, we have more than mere cohabitation involved in this case. Not only is Ember cohabitating with a married man nearly twice her age, she moved Lillian into this situation without her ever having met Bannister and after uprooting her once again and moving her halfway across the country. Quite simply, Ember has not demonstrated that she is able to present a stable environment for Lillian.

Considered against the backdrop of the underhanded approach taken by Ember to move Lillian to New York City, the record does not reveal a parent who is making good

decisions with regard to her daughter. Lillian did not know anyone in New York City other than Ember when she was abruptly moved there. While Ember is able to spend more time with Lillian because Ember is presently not employed, she is also unable to financially support herself, let alone Lillian. Ember is entirely dependent upon Bannister for her support and housing, and Ember acknowledged that she and Lillian would have nowhere to live if her relationship with Bannister ends. Ember also testified that should Andrew be awarded custody of Lillian, New York City is the only place that Ember currently has a "workable situation."

The majority emphasizes that no evidence exists to show that Lillian has been adversely affected by Ember's living arrangements. While it is true that there was no evidence that Lillian has been exposed to the sexual activity of Ember and Bannister, as noted in *Kennedy*, the lack of such evidence does not necessarily equate with a finding that Lillian's best interests are being served in this environment. Rather, the evidence tends to show that Ember is making decisions, changes in relationships, and far-reaching moves that serve *her* desires and musical interests rather than a consideration of how these changes affect Lillian. And, as the majority opinion correctly concluded with respect to the removal issue, moving Lillian such a great distance from Andrew has a detrimental impact on their relationship, a matter not seriously considered by Ember prior to making this unilateral decision to relocate Lillian.

In determining the best interests of Lillian, we are to consider, among other things, the moral fitness of the parents, the respective environments offered by each parent, the effect on the child as the result of continuing or disrupting an existing relationship, and the attitude and stability of each parent's character. *Smith-Helstrom v. Yonker, supra*. In my opinion, all of these factors weigh in favor of Andrew. The environment that Andrew can provide Lillian includes an intact family unit with half siblings for Lillian. Andrew and his family currently live in a home in a good neighborhood, with a yard and a nearby school and playground. Andrew has many relatives in the Kansas City area and an aunt who provides daycare for

Andrew's children without charge. Kansas City also presents many cultural opportunities and family activities. Andrew's lifestyle shows much greater stability; he has lived in the same area and worked for the same employer for several years. Lillian is well cared for by Andrew and his wife and is a happy, healthy child when in his care. Ember, on the other hand, demonstrates very little stability, as evidenced by her abrupt life changes. Ember has shown a pattern of "uprooting [Lillian] from stable environments" throughout her life. See *Steffy v. Steffy*, 287 Neb. 529, 537, 843 N.W.2d 655, 663 (2014). Ember continues to disrupt relationships with people in Lillian's life, which relationships in the past have included her maternal grandmother, Chesley; Lillian's stepfather, Day; and now Andrew and his family—not to mention other relationships that Lillian undoubtedly formed in the various places she has lived. At this young stage of her life, Lillian has apparently been able to adapt to all of the changes brought on by Ember. However, the lack of "negative impact" evidence should not be the sole factor in determining whether a modification of custody is warranted. Certainly, a sense of stability would be in Lillian's best interests.

Before concluding my discussion of the modification of custody, I must respond to the majority's reference to Andrew's prior difficulties in timely paying his child support obligation. I agree that this does not reflect positively on Andrew and that we should not be unconcerned about this. However, the trial court was presented with this evidence and it was presumably considered in the court's final decision. Many custody disputes present conflicting evidence which calls into question the relative strengths and weaknesses of each parent with respect to their parenting skills and attention to the needs of the children. The Nebraska Supreme Court and this court have recognized that in such a situation, the standard of review is often controlling:

> [W]here neither parent can be described as unfit in a legal sense but neither can be described as an ideal parent, . . . we give particular weight to the fact that the trial court saw and heard the witnesses in making necessary findings as to the best interests and welfare of the children.

*Davidson v. Davidson*, 254 Neb. 357, 369, 576 N.W.2d 779, 786 (1998). See, also, *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008).

In my opinion, the record, when taken as a whole, supports a finding that it is in Lillian's best interests to be placed in the custody of Andrew. Had the trial court known, at the time of the last modification order, that Ember would again, 6 months later, move Lillian to another state without prior court approval, it would likely not have granted Ember retained custody of Lillian and permission to move to Iowa. Andrew satisfied his burden of showing a material change in circumstances since the entry of the previous order, which change in circumstances affected Lillian's best interests and warranted a modification in custody.

## III. REMOVAL TO NEW JURISDICTION

Regardless of whether modification of custody occurs in this case, for the following reasons, I conclude that the district court did not abuse its discretion in denying Ember's postmove application to remove Lillian to New York. As such, I would affirm the order of the district court.

### 1. LEGITIMATE REASON TO LEAVE STATE

Although the district court did not explicitly provide analysis of this portion of the test in its order, after my de novo review, I conclude that Ember did not prove that she had a legitimate reason to move Lillian to New York. From my review of the record, Ember presented evidence on two reasons which she believed would validate her move from Iowa to New York: a new living arrangement and advancement of her music career. I conclude that neither of these was a legitimate reason to leave Iowa and move to New York.

Ember testified that after her separation and divorce from Day, she had no remaining connections to Iowa. She spent the following summer looking for a new living arrangement and settled on New York City. Having chosen New York City, Ember began a romantic relationship with Bannister and moved in with him, despite having little previous contact.

It is well established in Nebraska case law that remarriage is commonly found to be a legitimate reason for a move in removal cases. See *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). But in this case, Ember's desire to move was not based on remarriage or even a possibility of remarriage. In fact, Ember was moving in and beginning a relationship with a man she had known for only a little over a year before the move. Additionally, at the time of trial, Ember and Bannister were not even able to legally marry because Bannister was still married and supporting his estranged spouse. Ember's desire to establish a new living arrangement was not a legitimate reason for relocating to New York.

While legitimate employment opportunities for a custodial parent may constitute a legitimate reason for relocating, I do not believe that Ember carried her burden of showing that she had legitimate employment opportunities in New York.

Ember testified that the move to New York is beneficial for her music career because she can accomplish more in New York than she could have in Iowa. She also believed that the shows she plays in New York have "a lot more impact" for her career. Despite her belief that New York is a better location for her music career, Ember has not shown that moving to New York was for a legitimate employment opportunity or that the move has improved her music career. Ember did not produce any evidence to demonstrate exactly how her music career would be enhanced in New York. Ember is unemployed and, in fact, has argued that her lack of employment is beneficial in that she is able to spend more time with Lillian. While Ember has allegedly performed some shows and produced an album, there is absolutely no evidence that these activities have produced any income, record contracts, sales, or future bookings. At this stage, Ember has not realized any objective signs of success in the music industry gained from moving to New York and it appears that her music is more of a hobby. At the time of trial, Ember did not have any current income or means of financial support for Lillian besides Andrew's child support payments. She is also completely dependent on Bannister for her living expenses and a place to live. It is impossible

to conclude that the move to New York was for a legitimate employment opportunity.

Finally, Ember produced no evidence to support a conclusion that advancement of her music career could occur only in the New York area. A mere 4 months before leaving for the east coast, Ember agreed that the parties should continue to reside in the midwestern states of Iowa, Nebraska, or Missouri (the Kansas City area). Presumably, Ember was satisfied with the status of her music career at the time of such agreement. While Ember testified that she had no reason to stay in Iowa because of her separation and divorce from Day, she did not make any effort to seek a new living arrangement, support system, or employment in any of the agreed-upon states. There is no evidence that moving to the east coast was her only option. In fact, there is evidence in the record to support that Ember previously pursued her music career in a substantial way when she lived in Nebraska. While Ember may have quickly grown dissatisfied with her ability to actively pursue her musical ambitions in Iowa, she is the one who requested permission to move to Iowa (and thus represented that such a move was for a legitimate reason) before the last order. After recently being granted permission to move to Iowa, Ember's assertion that moving from Iowa is now necessary in order for her to find success in the music industry carries little weight, in my opinion. My review of the evidence shows that Ember made a hasty, unilateral decision to ignore the agreement and court order and to pursue a new living arrangement and support system in a place she had never lived, with a man she barely knew, and without any means of supporting herself or Lillian.

Thus, I believe that the evidence rather overwhelmingly shows that Ember has not demonstrated a legitimate reason for removing Lillian to New York.

## 2. Best Interests

Although I have concluded that Ember did not meet the threshold requirement of proving a legitimate reason for her move to New York, I will also engage in the best interests analysis for the sake of completeness. I conclude that Ember

did not demonstrate that allowing removal to New York is in Lillian's best interests.

### (a) Each Parent's Motives

As noted by the majority, Ember sought removal after she divorced Day, could no longer reside with his parents in Decorah, and needed to make decisions about relocation. The majority finds that Ember's reasons for selecting New York as a point of relocation were reasonable, given her aspirations as a musician. However, the majority does not address Ember's failure to research relocation in the agreed-upon states of Iowa, Nebraska, or Missouri (the Kansas City area). While Ember's motives for leaving Decorah are understandable, her motive in choosing to settle in New York is questionable given her previous agreement to remain in the midwestern states noted in the agreement. Finally, and perhaps more important, Ember admitted that she did not advise Andrew before moving Lillian to New York, because of her fear that he would again pursue custody. This admission shows a motive to frustrate Andrew's relationship with Lillian. As opposed to discussing with Andrew her situation and what would be best for Lillian, she led Andrew to believe that she was returning Lillian to Iowa at the conclusion of his summer parenting time on August 27, 2012. Then, by way of an e-mail 3 days later, Ember informed Andrew that she had moved Lillian to New York City. Although Ember extols the virtues of living there, at no point does she advise Andrew what Lillian's living situation was going to be or how Ember was going to provide for Lillian.

Andrew first opposed the move by not agreeing with the suggestions in Ember's e-mail that it was beneficial for Lillian to be in New York City. Certainly, Andrew's response was not unreasonable, given the abrupt and after-the-fact manner in which the move was dropped on him by Ember. At trial, Andrew opposed this move because of the difficulty the distance would place on his ability to have a relationship with Lillian, the instability in Ember's (and Lillian's) life, and his concerns over the living arrangements in New York City. I do not find that Andrew acted in a way to frustrate or manipulate Ember.

Having examined each party's motive in this case, I find that this factor weighs against removal.

### (b) Potential for Enhancing Quality of Life

#### *(i) Emotional, Physical, and Developmental Needs of Child*

Although it appears that Lillian has adapted to life in New York, this is the second substantial move that she has experienced at a young age. However, there was no evidence of how this move initially affected Lillian emotionally, although I note that Lillian had not even met Bannister at the time she moved in with him. There is nothing in the record to suggest that Lillian's physical needs are not being met in New York or were not being met previously.

The district court did note that the move to New York from Iowa has provided Lillian with exposure to dance and musical instruction as well as cultural influences which would be beneficial to her upbringing. However, there was no evidence presented as to what other options for dance and music instruction existed in the other agreed-upon states in order to determine whether the instruction in New York is superior, keeping in mind that this is a young child. In fact, the record shows that Lillian was also enrolled in a dance class while living in Iowa. And there are certainly cultural influences available in other areas than New York City.

I also feel inclined to note that while much emphasis has been placed by Ember on the artistic, creative, and cultural advantages existing in New York City, she fails to acknowledge that her recent agreement to live in Iowa, Nebraska, or Missouri (the Kansas City area) was presumably based upon her belief that living in such areas would be in Lillian's best interests. There are certainly advantages to children in having a midwestern upbringing, which seem to have been overlooked by Ember and the majority in this case. I believe the photographs of the respective neighborhoods contained in the record partially bear this out.

The majority gives great weight to Ember's having been the primary physical custodian of Lillian during her young life

and attributes the fact that Lillian is a happy, healthy child to Ember's influence. Without discounting Ember's abilities as a mother, the record shows that Ember has not been the sole caretaker of Lillian throughout her life. While Ember resided in Nebraska, her mother, Chesley, provided substantial care for Lillian when Ember was traveling for musical engagements, sometimes for weeks at a time. At some point, Ember moved in with Day and thereafter moved with him to Iowa, where they were married. Thus, Ember had the assistance of Day, and later his parents, in providing a home for and raising Lillian. And now, Ember and Bannister both testified to the assistance that he gives her in raising Lillian. Finally, and most important, Andrew has been a regular influence in Lillian's life, exercising all of his parenting time with Lillian, including school holidays and the bulk of the summer months. Thus, I disagree that we should attribute the meeting of Lillian's physical, emotional, and developmental needs to only Ember.

I conclude that this factor does not weigh in favor of or against removal.

### (ii) Child's Opinion or Preference

There is no evidence in the record to establish Lillian's opinion or preference. This factor does not weigh in favor of or against removal.

### (iii) Enhancement of Custodial Parent's Income or Employment

Ember argues that she has unlimited potential to enhance her income and employment by living in New York. She also notes that she can network within the music field without sacrificing time with Lillian. However, the evidence at trial showed that she has earned no income from this career while in New York and has actually assumed the role of a stay-at-home mother who is dependent on others to provide income. The majority emphasizes the benefit to Lillian of Ember's being able to be at home with Lillian during the day. While this certainly may be a benefit to a child in general, that is not the relevant consideration in this analysis. Rather, it is necessary to show

enhancement to income or employment in order to justify taking a child to a new jurisdiction farther away from the noncustodial parent. Ember has not shown in any concrete way how her music career has been improved by living in New York as opposed to living in any of the agreed-upon states. This factor weighs against removal.

### (iv) Degree to Which Housing or Living Conditions Would Be Improved

Before her move to New York City, Ember and Lillian lived with Ember and Day in his parents' home in Decorah. There is no further description of Lillian's living conditions in Decorah. After her move to New York City, Ember and Lillian began living with Bannister in a two-bedroom apartment located near Lillian's school and dance classes. Lillian has her own room in this apartment.

Because the living conditions in Iowa and New York cannot be compared, I conclude that this factor does not weigh in favor of or against removal.

### (v) Existence of Educational Advantages

Another factor to consider is whether New York provides Lillian with educational advantages that she would not receive in Iowa. After leaving Iowa, Lillian began kindergarten in New York. Ember testified that she heard New York public schools are some of the best in the country and that she opted Lillian into the best public school that was close to Bannister's apartment. Ember also testified that Lillian is receiving enhanced dance instruction and private music lessons in New York and that Lillian's musical abilities have flourished.

Despite the testimony about Lillian's school in New York, Ember did not show how an Iowa education compares with a New York education. Nor does the record indicate that Ember researched schools in any of the other agreed-upon states. This factor receives little or no weight when the custodial parent fails to prove that the new schools are superior. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2012); *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). As noted above, Ember also failed to show that the dance and music

instruction in New York is superior to that which is available in any of the agreed-upon states. Therefore, I do not weigh this factor in favor of or against removal.

### (vi) Quality of Relationship Between
### Child and Each Parent

The record shows that Lillian has a good relationship with each parent. Ember has been the primary custodial parent for the majority of Lillian's life (with assistance from others as noted above), while Andrew has exercised his allocated parenting time. This factor does not weigh in favor of or against removal.

### (vii) Strength of Child's Ties to Present
### Community and Extended Family

The record shows that Lillian and Ember do not currently have any family ties in either Iowa or New York. Ember does have family ties in Nebraska, although she has chosen to not have a relationship with Chesley, her mother, at this time. On the other hand, Andrew presented evidence of an extensive extended family network near the Kansas City area (one of the agreed-upon locations) that includes his parents, brother, aunts and uncles, grandmother, and many cousins. Andrew testified that Lillian has been able to form relationships within Andrew's extended family and that she has many young cousins. These relationships exist in one of the locations in which Ember previously agreed to live. Andrew is concerned that the considerable distance created by the removal would make it more difficult for Lillian to have these relationships. This factor weighs against the removal.

### (viii) Likelihood That Allowing or Denying
### Move Would Antagonize Hostilities
### Between Parties

There is no evidence in the record to suggest that either decision in this case would antagonize hostilities between the parties. This factor does not have any weight in the removal analysis.

(c) Impact on Noncustodial Parent
in Light of Reasonable Visitation

The third factor in our consideration of the best interests is the impact this move will have on Andrew's parenting time. Ember argues that the move will actually make it more convenient for Andrew to exercise his parenting time, because he will no longer have to drive to Des Moines to pick up Lillian, but, rather, he will only have to make a short drive to the nearby Kansas City airport to pick her up. Ember also stated that she is willing to assume all of the transportation costs. Finally, Ember asked that the current visitation schedule be maintained with the exception of Andrew's parenting time on Lillian's birthday weekend. Ember proposed that this time be added to Andrew's parenting time in the summer.

Andrew disagreed with Ember's conclusion that the move would have little impact on his relationship with Lillian. He noted that if Lillian lived in New York, it would no longer be feasible for him to drive to see her at any events that were outside his parenting time. He conceded that he had not visited Lillian in Iowa during the time she lived there, but testified that he had not been made aware of any such opportunity. Further, Lillian only resided in Iowa for approximately 1 year, during which time she was not in school and did not have school activities for Andrew to attend.

I agree with Andrew that the distance involved in the move from Iowa to New York greatly inhibits his ability to participate in any of Lillian's activities that fall outside his parenting time. The ability to participate in these activities will become more important as Lillian continues to get older. Further, I reject the majority's suggestion that Andrew could feasibly drive his entire family to visit Lillian for special occasions. A simple Internet search reveals that such a trip is nearly 1,200 miles, requiring approximately 19 hours of driving, each way. It is not hard to imagine the difficulties and expenses this "family road trip" would present to a family with two small children, where both parents work full-time jobs. This factor weighs against the removal.

### (d) Conclusion on Move

Having conducted a thorough review of the record in this case, I conclude Ember did not show that she has a legitimate reason to move Lillian to New York or that such a move is in Lillian's best interests. This case presents yet another difficult and unusual situation in the removal jurisprudence, which is the reason that I give deference to the trial judge's determination. See *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). I find that the district court's conclusion was not an abuse of discretion.

## IV. REMAINING ASSIGNED ERRORS

I concur with the majority opinion with respect to removal of the visitation restriction on Lillian's maternal grandmother, Chesley, and with regard to the determination of child support. As such, I would affirm the decision of the district court in its entirety.

------------------

State of Nebraska, appellee, v.
Lewis D. Rakosnik, appellant.
___ N.W.2d ___

Filed July 15, 2014.    No. A-13-663.

1. **Jury Instructions: Judgments: Appeal and Error.** An assigned error of incorrect jury instructions is a question of law, and an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.
2. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.
3. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.
4. **Trial: Testimony: Appeal and Error.** The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion.